## WEST REALTY & INVESTMENT CO. v. HITE et al.   (No. 8691.)*

(Court of Civil Appeals of Texas. Galveston. July 1, 1925. Rehearing Denied Oct. 8, 1925.)

**1. Brokers ⬤⟹52—Broker held not entitled to commission, in absence of sale or execution of contract of sale.**

Broker, whose contract with owners to sell their property did not entitle him to any commission unless sale was finally consummated, *held* not entitled to commission, where no sale was made to the prospective buyer nor binding contract of sale executed.

**2. Brokers ⬤⟹73—Brokers employed by broker held not entitled to commission from owner, where broker employing them was not entitled to commission.**

Where a broker was not entitled to commission for services rendered to owners in connection with his efforts to procure a purchaser, brokers employed solely by him were not entitled to commission from the owners.

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Action by the West Realty & Investment Company, a corporation, against Rosalie B. Hite and another. Pending the suit, the claim of the corporation was transferred to a partnership doing business under the style and firm name of West Realty & Investment Company, which intervened and became the plaintiffs. Judgment for defendants, and plaintiffs appeal. Affirmed.

Woods, King & John, of Houston, for appellants.

Gill, Jones & Tyler, of Houston, for appellees.

PLEASANTS, C. J. This suit was brought by appellants against appellees to recover commissions alleged to be due them for services performed, as real estate agents, in procuring for appellees a purchaser ready, willing, and able to buy property in the city of Houston, offered for sale by appellees.

At the time the suit was brought, the West Realty & Investment Company was a corporation. Pending the suit, the claim of the corporation was transferred to a partnership doing business under the style and firm name of West Realty & Investment Compa-

ny, which intervened and became the plaintiffs.

The material allegations of plaintiffs' petition are thus summarized in appellants' brief.

"By first amended original petition, appellant, West Realty & Investment Company, a corporation, sued Rosalie B. Hite and Mrs. Frankie Williams for the recovery of one-half of an agreed commission of 2½ per cent. on $250,000, to wit, $3,125, alleging, in substance, that appellees, Rosalie B. Hite and Frankie Williams, or, if not both, then appellee Frankie Williams employed Cabeen Blake as a real estate agent, agreeing to pay him such commission if he should sell certain described city property in Houston, on the following terms:

" 'The payment to defendants of $20,000 cash, and the assumption by the purchaser of a mortgage lien indebtedness of $18,500 against the lands, and the payment by the purchaser of $6,500 to cover the commission to be due the said Blake and plaintiff, as commission, etc., or the payment of $45,000 cash to defendants, out of which the commission and mortgage lien indebtedness was to be discharged, and, in addition, the purchaser to give his vendor's lien notes for $20,000 per year, due each year from one to 29 years after date, without interest; the purchaser in any event to pay a total of $625,000 for the lands, $580,000 of which should be divided into notes of $20,000 each, due serially as aforesaid, without interest.'

"And further that the said Blake employed the said West Realty & Investment Company to aid him in the sale, agreeing that, if the transaction should be completed, the commission would be divided equally between Blake and the realty company; that the realty company negotiated a sale of the premises on the terms authorized to R. S. Sterling, who was ready, willing, and able to purchase the property on the terms authorized; that appellees, without just or legal reason, declined to proceed further, refused to tender deed or go any further with the transaction and still so refuse; that the agreed commission was just and reasonable; and that, notwithstanding demand therefor, appellees refused to pay the same.

"Pleading in the alternative, the corporation asked that, if it should be determined it could not prosecute the suit in its own name, it be permitted to prosecute the suit in the name of Cabeen Blake, who refused, in behalf of plaintiff, to prosecute the suit."

Defendants' first amended original answer, upon which they went to trial, was, first, a general denial; second, a sworn denial of execution by defendants of any contract in writing by them or by their authority; and, third, that, if any contract were made, which is denied, it was made by mutual mistake of law, induced by misrepresentations of Blake that the deal meant absolutely that defendants would secure $625,000 for their property, which representations were relied on by defendants and were incorrect; that defendants resided in New York and were ignorant of Texas law; that Blake resided in Texas and was familiar with the local law and was

---

an old friend of the defendants, in whom they reposed trust, confidence, et cetera..

The trial in the court below without a jury resulted in a judgment in favor of the defendants.

The evidence shows that appellees, Miss Rosalie B. Hite and Mrs. Frankie Williams, who owned the property for the sale of which, or rather for services rendered in obtaining a purchaser ready, willing, and able to buy, appellants' claim for commission is based, expressed to their friend Mr. Cabeen Blake a willingness to sell the property for $625,000, $25,000 cash and $20,000 annually for 30 years, and to allow him a commission of 2½ per cent. Mr. Blake informed Mr. West, one of the appellants, whose company was engaged in the real estate business, that the property was for sale on these terms, and agreed with Mr. West to divide commissions with him if they succeeded in selling the property. In regard to his agreement, with the appellees Mr. Blake testified:

."The conversation about my selling this property first came up between Miss Hite and myself; the effect of that conversation was, to my understanding, that, if I sold the property for them, they would pay me the same commission that they would pay anybody else or better. The matter was taken up in my office, in the assessor's office. I was never in the real estate business; never sold a piece of real estate in my life except my own. On that occasion Miss Hite said, if I could sell the property for them, they would be glad to pay me the commission, as much as they would pay anybody else or more, and gave me the terms, which were different—that was some 8 years ago, and the terms were different from what they were in the Sterling deal. I never had any authority to close anything at any time. In other words, they never did authorize me to make any particular deal. They merely stated, in effect, that, if I found somebody that would buy this property on terms satisfactory to them, and if they closed the deal, they would pay me a commission. They never, at any time, made any absolute proposition of terms, of what they would sell this property at, other than is shown by the correspondence. Miss Hite never told me that, if I found somebody willing to pay this, she would pay me a commission, regardless of whether she actually closed the deal or not. I never had any such arrangement as that with her. My agreement with them was that, if the property was sold, I was to receive a commission. My understanding was that the sale of the property meant that the deal should go through. That is the only way I would have accepted the commission. Up to the time of the exchange of the letters and telegrams that have been introduced here, there was nothing said in any letter or telegram that passed between us, that changed my understanding of the conditions under which I would be entitled to a commission on this property. In other words, there never was any definite statement by these ladies that, if I found a purchaser ready, willing, and able, or a purchaser who would pay this $625,000 in the manner specified, I would be entitled to a commission, regardless of whether they closed the deal or not, nor was there any-

thing to that effect. Mr. West first told me that he had a party that would meet the proposition. I had told him about the proposition, either verbally or in writing, I have forgotten which, probably both. Then I think the next day he told me it was R. S. Sterling, and we went to see Mr. Sterling together. That is my recollection. My statement is that Mr. West first informed me that he had a purchaser who would meet the terms, and the following day put me in touch with Mr. Sterling. All the conversations, letters, and telegrams that I have referred to were between Miss Hite and me. Up to the time those ladies came down there, I never had any conversation relative to selling this property, or any letter or telegram from Mrs. Williams. I knew that the property belonged to Mrs. Williams and Miss Hite, as the executors of an estate, under a will. I don't know that I knew that the will provided that they had power of sale under certain conditions; I just assumed that they did. I knew it didn't belong to them personally, but belonged to them in their capacity as executors."

The witness Cabeen Blake testified, on redirect examination, as follows, to wit:

"I testified on direct, and I believe on cross both, that the substance of this conversation with Miss Hite, 8 years ago, was that, if I sold the property for them, they would pay me a commission. Anything that I testified to on cross-examination about not being entitled to a commission unless the sale actually went through is based on my understanding of the conversation. In that conversation it was not actually discussed whether or not if, after a trade was made, they backed out, I would get a commission; that was not mentioned. In other words, the only words used between us that I can recall was that, if I sold the property, they would pay me the same commission that they would. any real estate agent, or a better one."

A number of letters and telegrams between defendants and Mr. Blake were put in evidence. In none of them is there any agreement to pay Blake a commission, regardless of whether a sale should be consummated, nor is there any unconditional acceptance of any of the offers submitted.

The first offer submitted by Sterling, which was contained in a letter from West to Blake, which was forwarded by Blake to defendants, who were then in Paris, France, was an offer for an option on the property, or a 30 years' contract, the exact nature of which is not shown by the evidence. In response to this offer, Miss Hite wrote Blake the following letter:

"Mr. E. Cabeen Blake, Houston, Texas—My dear Mr. Blake: Your letter from Los Angeles inclosing one from Mr. S. D. West received today. We are not in a position to give an option of the kind proposed, as we are figuring with parties wishing to close an immediate deal, which we are considering, however, if your parties are in a position to close a deal now, we would consider a 30-year contract of the nature suggested, thereby lessing the obligation $100,000, provided, they pay the commission and assume the mortgage of $18,500 (instead of

$15,000). Should your client wish to figure on this proposition you might communicate with me again at New York. Mrs. Williams and I are returning to America Oct. 19th, and could then better handle the situation.

"Very truly,     Rosalie B. Hite."

The next communication to defendants of any offer from Sterling was the following telegram sent by Blake to Miss Hite at New York on October 19, 1922:

"R. S. Sterling has today deposited with me one thousand dollars to bind a trade on the Texas avenue property on basis of twenty-five thousand initial payment and twenty thousand per annum for thirty years stop Wire me authority to sign earnest receipt or your pleasure in the matter.     Cabeen Blake."

Various telegrams and letters then passed between Blake and Miss Hite in regard to the Sterling offer; Blake explaining and approving the offer, and Miss Hite insisting on further details and declining to commit herself to an unconditional acceptance. On October 25th, she telegraphed Blake as follows:

"Your letter answered no questions. Expected wire to-day answering initial payment stop Answer subjects by number night letter stop Firstly initial payment, secondly erection of building, thirdly assumption of Wicks lease expiring February first nineteen twenty-five."

In response to this telegram, Blake sent the following:

"Miss Rosa B. Hite: Great Northern Hotel New York N. Y. Sterling will pay twenty five thousand dollars cash and twenty thousand dollars per annum for thirty years additional he will assume the Wicks lease as it stands will not obligate himself in contract to erect a building but of course he would have to do so in order to make his investment profitable to him Sterling is president of the Humble Oil Company and is personally worth over twelve millions of dollars and his notes together with the lien on the property are as good as government bonds he suggests that if you will come to Houston you can easily be convinced of his ability to carry out his contracts and that you will receive your six hundred and twenty-five thousand dollars, this was the way I understood your letter from Paris and I told Sterling if he would make this offer I was sure we could close the deal like all big business men he does not like to change his original proposition. Your letter of Sunday has never reached me.

"Cabeen Blake."

Upon receipt of this telegram, defendants came to Houston and resumed negotiations with Sterling. What their negotiations were and their result is thus stated in an agreement signed by the attorneys for the parties to this suit, and introduced in evidence:

"Stipulation:—At the time Miss Hite and Mrs. Williams reached Houston, Mr. Sterling offered to pay $45,000 cash and execute 29 notes due one each year for 29 years in consideration for a present warranty deed conveyance of the prop-erty described in the plaintiff's petition, the deed to reserve a vendor's lien to secure the notes and deed of trust, if required. These ladies offered to make the deal if some arrangement or contract could be entered into whereby they would be assured of receiving $20,000 per year for 29 years, no more and no less. The reason for using a contract in the nature of a lease being the fear that, if deed and notes were passed and vendors had to foreclose, the courts would deduct unearned interest from the face of the notes. That vendors wanted to avoid this possibility by arranging for a contract in the nature of a lease with sales option or agreement containing penalties so severe as to insure lessee and executory vendee paying the $20,000 per year without interest absolutely. And counsel for the ladies and Mr. Sterling had many conferences endeavoring to work out some plan whereby the deal could be made and this income of $20,000 assured to these ladies beyond peradventure. At a conclusion of these negotiations counsel for Mr. Sterling stated that they would not recommend to Mr. Sterling any sort of lease arrangement, executory contract arrangement, or any other sort of deal than a present deed and vendor's lien notes. Mr. Sterling stated he would follow the advice of his attorneys, and further negotiations were dropped."

Plaintiffs in this suit had no agreements or communications of any kind with the defendants. All of their communications were with Blake, and consisted of submitting to him Mr. Sterling's offers. We think this evidence amply sustains the judgment of the trial court. Appellants predicate their appeal upon the following propositions:

"First. In the absence of any stipulation to the contrary, the ordinary duty of a real estate broker to sell, or procure a purchaser, is performed when he has done the thing which he was employed to do; that is, has procured a purchaser ready, willing, and able to buy, and who offers to buy on the terms stipulated by the employing owner, regardless of the nature of the employer's interest.

"Second. Even if a broker's commissions are expressly conditioned upon the consummation of the contract to be negotiated, if such consummation is prevented by the arbitrary action of the broker's employer, the condition is thereby waived, and the broker may recover his commission in spite of the fact that the contract is never consummated.

"Third. An equitable or constructive assignment does not depend upon any particular form of words, but the court of equity constructs the assignment out of the situation of the parties. Any language or act which makes an appropriation of a fund amounts to an equitable assignment of that fund. No particular form of words or form of instrument is necessary."

The abstract soundness of each of these propositions may be conceded, but the evidence before set out does not require their application in this case.

[1, 2] The right of appellants to recover compensation for their services in procuring Sterling as a purchaser for appellees' property must, in the absence of allegations and

proof of fraud and collusion between Blake and appellees, depend upon Blake's right to recover against appellees, and, whatever interpretation might have been placed on the agreement between Blake and appellees for his compensation, the trial court was clearly authorized, if not required, to give it the meaning which both parties intended it should have, and, when so interpreted, Blake was not entitled to any commission unless a sale of the property was finally consummated. Blake testified unequivocally that this was his understanding of the agreement. No sale having been made or binding contract of sale executed, Blake was not entitled to any commission, and appellants, who had no agreement or communication of any kind with appellees on the subject, and whose only claim against appellees is based upon an equitable assignment of one-half of the commissions due Blake, were properly denied any recovery.

These conclusions are, we think, so obviously sound, and are based on such fundamental principles, that citation of authority is unnecessary.

The judgment of the trial court has been ordered affirmed.

Affirmed.